STATE

v.

**Harold J. FARRELL, Jr.**

**No. 81-196-C.A.**

Supreme Court of Rhode Island.

April 1, 1982.

Travelers. However, the mathematical differ-   ence will be resolved after remand.

Dennis J. Roberts, II, Atty. Gen., James P. Renaldo, Sp. Asst. Atty. Gen., for plaintiff.

William J. Burke, William P. Butler, Pawtucket, for defendant.

## OPINION

SHEA, Justice.

In this case the defendant, Harold J. Farrell, Jr., (Farrell) appeals his conviction after jury trial in the Superior Court, for possession of a stolen motor vehicle and for possession of a motor vehicle with an altered identification number. He was given a five-year sentence on the stolen vehicle charge and a one-year suspended sentence with one year probation on the other charge.

On appeal, Farrell has raised four issues. The first issue challenges the search and seizure of the car in question. He claims this was done in violation of his Fourth Amendment rights. We agree. Our resolution of this issue mandates a new trial, therefore we will not consider the other issues raised.

The relevant facts are as follows: During the evening hours of October 17, 1979, defendant left a 1978 Lincoln Versailles for repairs at Charlie's Garage at the corner of Dexter Street and Barton Street in Pawtucket. He requested that the owner of the garage, Charles Bozo, repair a dent on the left front fender of the car. On the following day, Sergeant Charles F. Dolan of the Pawtucket Police Department received a call that a 1978 Lincoln Versailles might be at Almat Auto Body at 205–207 Dexter Street, which is in the same building as Charlie's Garage.[1]

Dolan, accompanied by Detective Joseph R. Monteiro, went to 205–207 Dexter Street to conduct an investigation.[2] Upon their arrival the officers saw the Lincoln parked in the parking area of Almat Auto Body located in the front of the building. This was not the parking area for Charlie's Garage. Charles Bozo was in the process of putting a colored stripe down the side of the car. Sergeant Dolan made a visual inspection of the Lincoln and noticed that it had no license plates and that the vehicle identification number appeared to have been tampered with.[3] He then opened the driver's door and observed that the mylar sticker that also contains the vehicle identification number had been scraped off.

The officers then returned to the police station and checked the identification number through the National Auto Theft Bureau. They learned that the identification number from the Lincoln they had just observed actually belonged to a car that was, according to Dolan, "a total burnout, [a] stolen vehicle that sold for $900. No way possible could that vehicle [have been] on the road."

At this point Dolan and Monteiro, now joined by Ronald Potter, an agent of the National Auto Theft Bureau, returned to the auto body garage. They had not obtained a search warrant. Upon their arrival the officers engaged in conversation

---

1. At this time, Almat Auto Body and Charlie's Garage were practically indistinguishable entities as Sergeant Dolan testified at the suppression hearing. There was one building at 205–207 Dexter Street containing an office and three stalls to a garage. Charlie's Garage and Almat Auto Body shared the interior space. According to Dolan, the premises once housed a gasoline service station.

2. There is nothing in the record to explain why the presence of a 1978 Lincoln Versailles at an auto body shop would arouse police attention.

3. Dolan testified that he observed the vehicle identification number by looking through the windshield from the outside. It appeared to have been tampered with because the metal tab on which the number was printed had a bend in it, which to him was unusual.

with one Armando Zangari who was on the premises. He testified that he worked at Almat Auto Body but that it was owned by his son, Anthony Zangari. He testified also that Farrell was his nephew. There is conflicting testimony about what occurred next. Sergeant Dolan stated at the suppression hearing that he asked Armando Zangari if it would be possible to take the Lincoln to the police station for further investigation to determine ownership of the vehicle. Zangari agreed. Zangari, on the other hand, testified that Sergeant Dolan told him that he was going to impound the vehicle. In any event, Zangari's son volunteered to drive the Lincoln to the police station. Charles Bozo, standing nearby, offered to follow the Lincoln in his own car to give Zangari's son a ride back. Once at the station, Bozo gave the keys to the Lincoln to the police upon the assurance that the car would be returned "if it checked out."

The police examined the car further. This involved searching for identification numbers under the fenders within the wheel well, on the engine block, and within the trunk area, as well as looking for evidence indicating whether or not the car had ever been in a fire. By the end of this inspection the police were convinced that the 1978 Lincoln was a stolen car. They again contacted the National Auto Theft Bureau, this time to check for other stolen cars that fit the Lincoln's description. A 1978 Lincoln Versailles matching the description was reported stolen on September 24, 1979, from the parking lot of a Star Market in Brookline, Massachusetts. It belonged to Owen Motors, a Lincoln/Mercury dealer, and was used by Frank Owen, the owner, and his wife, Rose.

In due course Farrell was arrested and charged with the two-count indictment for which he stands convicted. Prior to trial defendant timely moved to suppress all the

evidence gathered by the police as a result of the warrantless search and seizure of the vehicle. The suppression hearing was held on several dates in late October and November of 1980 before a justice of the Superior Court. The defendant testified that he did leave a Lincoln Versailles with Charles Bozo on the night of October 17, 1979, for repairs and he answered yes when asked by his attorney if he "claimed a possessory interest" in the vehicle. On cross-examination, Farrell claimed that he had purchased the Lincoln a few months earlier from Rocha's Auto in Portsmouth, Rhode Island. He said he had purchased the car as a repairable wreck that had been involved in a fire and that the purchase price had been $1,500. The defendant also claimed that Charles Bozo had done all of the restoration work, which was substantially completed as of October 17.

After considering the evidence presented at the suppression hearing, the trial justice ruled that the warrantless seizure and subsequent search of the Lincoln by the Pawtucket police did not violate defendant's Fourth Amendment rights. He concluded as follows:

"[T]he issue on the motion to suppress is the illegal taking of the vehicle. And after hearing the believable evidence in this hearing so far, there is no foundation for the motion whatsoever. The vehicle was taken with consent. It was operated by the parties involved working for Almat Auto Body with consent and actually removed to the police station. There is simply no foundation for this motion whatsoever. The motion is denied."

■ The issue before us on appeal is whether the consent given by Zangari and/or Bozo relieved the police from the necessity of obtaining a warrant prior to any seizure and search of the car.[4]

---

4. As an initial matter, we note that the state has not raised an issue challenging defendant's standing to assert an alleged Fourth Amendment violation. The focus of such an inquiry would be defendant's legitimate expectation of privacy in the area searched or the property seized. *Rawlings v. Kentucky*, 448 U.S. 98, 100

S.Ct. 2556, 65 L.Ed.2d 633 (1980); *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). *See also State v. Porter*, R.I., 437 A.2d 1368 (1981) (applying the holding in *Salvucci* retro-

The United States Supreme Court in *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), reaffirmed the principle that a search and seizure of property, without a warrant and without probable cause, but with proper consent voluntarily given, is valid under the Fourth Amendment. Subsequently, in *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), the Court had occasion to consider what constitutes a proper third-party consent, and it responded by providing the following standard:

"[W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." (Footnote omitted.) *Id.* at 171, 94 S.Ct. at 993, 39 L.Ed.2d at 249–50.

The Court went on to indicate that "common authority" is not to be inferred from the mere property interest a third party has in the property.

"The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements * * * but rests rather on mutual use of the property by persons generally having joint access or control for most purposes * * *." *Id.* at 171 n.7, 94 S.Ct. at 993 n.7, 39 L.Ed.2d at 250 n.7.

In a situation in which two persons such as a husband and wife have equal rights to the use or occupation of certain premises, either may give consent to a search, and the evidence thus disclosed can be used against either. *United States v. Ocampo*, 492 F.Supp. 1211 (E.D.N.Y.1980), *affd. in part*, 650 F.2d 421 (2d Cir. 1981). *See also Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) (joint tenant of house can consent to search of entire house). In *State v. Cairo*, 74 R.I. 377, 60 A.2d 841 (1948), this court upheld a

warrantless search when a joint owner of the premises searched consented to a search of the cellar area used in common by two different families. In contrast to these situations however, a landlord ordinarily cannot validly consent to the search of his tenant's apartment, *Chapman v. United States*, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961), nor can a night clerk's consent validate a warrantless search of a hotel guest's room. *Stoner v. California*, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964).

Third-party consent is not limited to situations involving the joint use of homes or other living quarters. For example, in *Frazier v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969), the Supreme Court, relying on consent given by the co-owner of a duffel bag, upheld the warrantless search of the bag. On the other hand, where the property is given to a third party for a specific purpose other than to confer common authority on that person, courts have not found the requisite mutual use or joint control necessary to justify the third-party consent. Where a common carrier (United Parcel Service) consented to the FBI's warrantless seizure of books and magazines which had been consigned to the carrier for shipment, such seizure was found to lack the consent necessary to satisfy the Fourth Amendment. *United States v. Kelly*, 529 F.2d 1365 (8th Cir. 1976). Also, when a caretaker allowed officers to enter a garage a portion of which was leased by the defendant, the consent to search was improper and the seizure of goods illegal. *Niro v. United States*, 388 F.2d 535 (1st Cir. 1968). Finally, in a case with facts closer to our own, the Supreme Court of Illinois held that consent by the owner of a house to a search of an automobile in his garage but belonging to defendant was improper. It was not supported by any theory of apparent authority, and thus the objects found in the car were inadmissible. *People v. Miller*, 40 Ill.2d 154, 238 N.E.2d 407, *cert. denied*, 393 U.S. 961, 89 S.Ct. 401, 21 L.Ed.2d 375 (1968).

actively). We decline to consider this issue since it has been waived by the state.

In the matter before us, we cannot justify Zangari's and/or Bozo's consent to seize and search the Lincoln on the basis of any theory of "common authority." The doctrine that recognizes the validity of third party consent to a search must be applied cautiously to prevent erosion of Fourth Amendment protections. This is especially true because consent eliminates the requirement of probable cause. As the Supreme Court in *Stoner v. California, supra,* stated:

"Our decision make clear that the rights protected by the fourth amendment are not to be eroded by strained applications of the law of agency or by unrealistic doctrines of 'apparent authority.'" *Id.* at 488, 84 S.Ct. at 892, 11 L.Ed.2d at 860.

We hold that one who entrusts his automobile to another for the purposes of repair, or periodic inspection as required by law, does not confer the kind of mutual use or control which would empower that person to consent to a warrantless search and seizure. In view of our finding of no consent, coupled with the failure of the state to justify the warrantless seizure on any other ground, the evidence obtained by the police as a result of the seizure is inadmissible and should have been suppressed. The defendant is entitled to a new trial.

Therefore, the defendant's appeal is sustained, the judgment of conviction is reversed, and the papers are remanded to the Superior Court for further proceedings consistent with this opinion.