824 A.2d 999

Ronald L. SELDON

v.

STATE of Maryland.

No. 597, Sept. Term, 2002.

Court of Special Appeals of Maryland.

May 29, 2003.

206

Argued before MURPHY, C.J., GREENE, BISHOP and JOHN J., JR., (Ret'd, specially assigned), JJ.

MURPHY, Chief Judge:

In the Circuit Court for Anne Arundel County, Ronald L. Seldon, appellant, was convicted of possession with the intent to distribute more than 448 grams of cocaine and related violations of the Maryland Controlled Dangerous Substances Act. Appellant concedes that the evidence was sufficient to establish that he committed those offenses on July 13, 2000, but argues that the circuit court erred in denying his Motion to Suppress that evidence. Appellant now presents two questions for our review:

I. DID THE LOWER COURT ERR WHEN IT DE-NIED APPELLANT'S MOTION TO SUPPRESS THE SEARCH OF HIS VEHICLE THAT OC-CURRED ON OCTOBER 29, 1999?

II. DID THE LOWER COURT ERR WHEN IT DE-NIED APPELLANT'S MOTION TO SUPPRESS THE SEARCH OF HIS VEHICLE THAT OC-CURRED ON JULY 13, 2000?

For the reasons that follow, we shall answer "yes" to each question, and we shall therefore reverse the judgments of the circuit court.

## Factual Background

### I. The October 29, 1999 Search

On October 26, 1999, appellant drove his vehicle to Pohanka Mazda, an automobile dealership in Salisbury, Maryland.[1] On October 29, 1999, an employee of the dealership contacted the Wicomico County Police Department to report that something "suspicious" had been discovered in a vehicle that had been

---

1. On October 26, 1999, appellant dropped off his vehicle because it was "stalling out." Although the specific problem was not diagnosed imme-diately, it was ultimately determined that the fuel pump had to be replaced.

brought in for service. Detective Carson Wentland of the Wicomico County Police Department received the call. Before proceeding to the dealership, he contacted the Maryland State Police and requested assistance. Maryland State Police Sergeant Michael Lewis was dispatched to the dealership. When Sergeant Lewis and Detective Wentland arrived, they were directed to appellant's vehicle by Bruce Willey, the mechanic who had made the repairs, and John Fiscus, a supervisor. At the time the officers arrived, appellant's vehicle had been repaired and was ready to be picked up.

Sergeant Lewis directed Mr. Willey to drive the vehicle into the service bay area. Once the vehicle was in the service bay, Mr. Willey pointed to the section of the vehicle where he had discovered the suspicious item. Sergeant Lewis then entered the vehicle, pushed back the front seat, lifted the carpet, and observed a secret compartment.[2] He lifted the lid of the compartment and looked inside, but found nothing. Upon further examination of the vehicle, Sergeant Lewis discovered a second secret compartment which was located in the gas tank. This compartment, which was electrically and hydraulically powered, could not be opened by hand. Sergeant Lewis attempted to open the compartment by using his "alligator grips," but his attempt was unsuccessful. He then used a screwdriver to pry open the compartment "slightly," and was able to determine that there was no contraband in the compartment. Sergeant Lewis reported his findings to the Wicomico County Narcotics Task Force, and was told by a member of that organization that appellant was a suspected drug dealer in the area. Because no contraband was found in appellant's vehicle, the officers took no further action on this occasion.

## II. The July 13, 2000 Search

On July 13, 2000, Sergeant Lewis spotted appellant's vehicle traveling eastbound on Route 50 near Annapolis, Maryland,

---

**2.** The compartment had a hinged metal door, which could be opened only after two metal bolts were unfastened.

and stopped the vehicle because it was traveling at the speed of 71 m.p.h in a posted 55 m.p.h. zone. Appellant was the sole occupant of the vehicle. Sergeant Lewis approached the passenger side of the vehicle and, through an open window, asked for appellant's license and registration. According to his suppression hearing testimony, at this point Sergeant Lewis noticed: (1) a strong odor of air freshener coming from the interior of the vehicle; (2) law enforcement decals affixed on the vehicle's windshield; (3) the "definitive odor of cocaine;" and (4) a large "wad" of money that came protruding out of appellant's pocket as appellant reached for his driver's license.[3] Sergeant Lewis also testified that appellant seemed to be "extremely nervous," that appellant's "carotid pulse was pounding," and that all of these observations were consistent with illegal drug activity.

When Sergeant Lewis examined appellant's license and registration, he realized that appellant was under investigation by the Wicomico County Narcotics Task Force, and recognized appellant's vehicle as the vehicle searched nine months before at Pohanka Mazda. Sergeant Lewis returned to his vehicle and placed a call to determine the status of appellant's license. After being informed that the license was valid, Sergeant Lewis called Sergeant Michael Kenhart of the Wicomico County Narcotics Task Force. During this conversation, Sergeant Lewis stated that he had stopped appellant for a traffic violation and that he "had enough to do him," but wanted to know whether the arrest of appellant might adversely affect any Task Force investigation. Sergeant Kenhart responded that appellant was still under investigation, and he would call back with an answer. A few minutes later, Sergeant Kenhart called back, and told Sergeant Lewis that the Task Force had no objection to appellant's arrest. At this point, Sergeant Lewis called for backup and requested a canine unit,[4] and activated a video and audio recording system

---

3. It was later determined that appellant had $3,000.00 on his person.

4. A canine unit was not available to respond to the scene.

that provided the suppression hearing court with the ability to review the stop from that point forward.

Sergeant Lewis again approached appellant's vehicle, and asked appellant to step out. Sergeant Lewis then asked appellant for permission to search the vehicle. Appellant refused that request. Sergeant Lewis continued to converse with and question appellant until the backup unit arrived. Once the backup unit arrived, Sergeant Lewis patted down appellant to search for any weapons.[5] Sergeant Lewis then proceeded to search the vehicle. Almost immediately, he located the two steel compartments that he had previously searched at the dealership.[6] The compartment located underneath the front passenger seat was empty. A search of the second compartment turned up what appeared to be one package of cocaine and two packages of marijuana, each of which was covered by a fabric softener secured by saran wrap and clear packaging tape.[7] Appellant was arrested and charged accordingly.

### III. The Circuit Court's Ruling

After a hearing on appellant's Motion to Suppress, the circuit court filed a Memorandum and Order that included the following findings of fact and conclusions of law:

Two separate searches occurred as previously outlined. The Court will therefore separately examine the constitutionality of each search.

*July 13, 2000*

In assessing the constitutionality of the search of Defendant's vehicle, the Court must first determine whether Sergeant Lewis' stop of the vehicle was reasonable. The

---

5. No weapons or drugs were found on appellant's person.

6. Another officer who was on the scene was amazed at how fast Sergeant Lewis located the compartments.

7. Field tests were concluded on the cocaine and marijuana. The tests were positive. The total weight of the cocaine was 497 grams, with 125 grams of packaging. The total weight of the marijuana was 854 grams, with 122 grams of packaging.

Maryland Court of Special Appeals reiterated the Supreme Court guidelines that "the level of suspicion required for a stop is considerably less than the proof needed for probable cause." *Lawson v. State*, 120 Md.App. 610, 618, 707 A.2d 947 (1998)(*citing Quince v. State*, 319 Md. 430, 433, 572 A.2d 1086 (1990)); *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).

The initial stop of Defendant's vehicle for speeding was legitimate and reasonable. Sergeant Lewis testified that while traveling behind Defendant's vehicle, he paced Defendant speeding at approximately 71 m.p.h. in a 55 m.p.h. zone. Consequently, Sergeant Lewis was justified in stopping Defendant for a traffic infraction, which has been acknowledged by Defendant.

The Fourth Amendment protects against unlawful searches and seizures including seizures that involve only a brief detention. *United States v. Mendenhall*, 446 U.S. 544, 551, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). A traffic stop is a detention that implicates the Fourth Amendment. *United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). The Supreme Court has made it clear that a detention should only last as long as it [sic] necessary to effectuate the purpose of the stop. *Ferris v. State of Maryland*, 355 Md. 356, 369, 735 A.2d 491 (1999)(*quoting Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). As previously discussed, the stop, of Defendant implemented the Fourth Amendment but was a valid seizure based on probable cause-the Defendant was speeding. There are numerous cases that discuss when it is appropriate for an officer to detain a driver for further investigation, once the purpose of the traffic stop has been fulfilled. In two instances the detainment is constitutionally permissible under the Fourth Amendment: (1) the driver consents to the continuing intrusion; (2) the officer has a reasonable, articulable suspicion that a crime is being or is about to be committed. *Ferris*, 355 Md. at 372, 735 A.2d 491 (*citing United States v. Sandoval*, 29 F.3d 537, 540 (10th Cir.1994)). To determine whether a seizure has oc-

curred under the Fourth Amendment, the test is whether in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. *Ferris,* 355 Md. at 376, 735 A.2d 491.

Before addressing the issue of consent and reasonable suspicion, the Court must determine whether the stop of Defendant constituted one or two stops. The Court is assisted by the video tape which provides a minute by minute recordation of the stop. Sergeant Lewis stopped Defendant at approximately 1:50 p.m. and activated the recording system immediately thereafter. At 1:53 p.m. Sergeant Lewis received confirmation that Defendant's license was valid. At 2:00 p.m. Sergeant Lewis received information regarding the registration of the vehicle. Sergeant Lewis testified that in this time period he began to prepare a warning citation for the speeding offense. Sergeant Lewis returned to Defendant's vehicle at 2:03 p.m. It is inferred that if this had been a routine traffic stop without incident, Sergeant Lewis would have returned Defendant's driver's license and vehicle registration, issued the warning and Defendant would have been on his way. The stream of events did not occur. Defendant was not given his license, registration or a citation. Sergeant Lewis had already determined before he approached Defendant's vehicle for the second time that he was going to search the vehicle. It is evident that Sergeant Lewis removing Defendant from his vehicle was not justified by the first stop for speeding. The Sergeant's initial purpose in stopping Defendant was to enforce the laws of the roadway and to investigate the manner of driving with the intent to issue a citation or warning. Once the purpose of the stop was fulfilled, the continued detention of the car and occupant amounted to a second detention. *Id.* at 372, 735 A.2d 491; *See Royer,* 460 U.S. at 500, 103 S.Ct. 1319. Consequently, at 2:03 p.m. the initial stop concluded and a second and separate stop began. The Court must, therefore, determine whether Defendant consented to the questioning outside the vehicle or if Sergeant Lewis had a reasonable and articulable suspicion to

support the second detainment of Defendant. A consensual encounter is defined as the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement official. *Ferris*, 355 Md. at 373, 735 A.2d 491 (*citing United States v. Werking*, 915 F.2d 1404, 1408 (10th Cir.1990)). In this type of encounter, a private citizen is not seized under the meaning of the Fourth Amendment, because he is free to leave at any time. *Id.* Questioning an individual is allowed as long as the officer does not convey a message that compliance with the request is required. *Ferris*, 355 Md. at 375, 735 A.2d 491 (*quoting Florida v. Bostick*, 501 U.S. 429, 434–35, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)). The test is objective, not subjective, therefore the Court must decide whether a reasonable person would have believed that he was free to end the conversation or encounter. *Ferris*, 355 Md. at 375, 735 A.2d 491. The Court looks at a variety of factors including:

the time and place of the encounter, the number of officers present and whether they were uniformed, whether the police removed the person to a different location or isolated him or her from others, whether the person was suspected of a crime, whether the police retained the person's documents, and whether the police exhibited threatening behavior or physical contact that would suggest to a reasonable person that he or she was not free to leave.

*Id.* at 377, 735 A.2d 491. Sergeant Lewis walked to the driver's side of Defendant's vehicle and stated to Defendant, "Come on back here. I wanna talk to you for a minute-come back here." The parties proceeded to a location away from the side of the road and between the two vehicles. As evidenced by the video tape, Sergeant Lewis stood two to three feet from Defendant. At that time, Sergeant Lewis was still in the possession of Defendant's driver's license and registration, had not yet issued any type of citation, and suspected Defendant of committing a crime-possession of CDS. Defendant did not voluntarily exit the car, did not consent to the questioning and he was not free to leave at any time. A reasonable person in the position of Defendant

would not have felt free to leave, consequently a seizure occurred.

The Court, therefore, must determine whether the detainment of Defendant was based on reasonable and articulable suspicion of criminal conduct to determine whether it was a constitutional seizure. The United States Constitution requires that "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 384, 735 A.2d 491 (*quoting Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). The standard is objective as to whether a reasonably prudent person in the officer's position would have been warranted in believing that Defendant was involved in criminal activity that was afoot. *Ferris,* 355 Md. at 384, 735 A.2d 491 (*citing Derricott v. State,* 327 Md. 582, 588, 611 A.2d 592 (1992)). Any determination of reasonable suspicion must be based on the totality of the circumstances-the whole picture. *Ferris,* 355 Md. at 385, 735 A.2d 491 (*citing Sokolow,* 490 U.S. at 8, 109 S.Ct. 1581, *quoting United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). The suspicion is less that the level of probable cause. *Ferris,* 355 Md. at 385, 735 A.2d 491 (*citing Graham v. State,* 325 Md. 398, 408, 601 A.2d 131 (1992)). "[I]t is not enough that law enforcement official can articulate reasons why they stopped someone if those reasons are not probative of behavior in which few innocent people would engage-the factors together must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied." *Karnes v. Skrutski,* 62 F.3d 485, 493 (3rd Cir.1995).

When Sergeant Lewis approached Defendant's vehicle and asked for his license and registration, he made numerous observations. He observed a strong odor of air fresheners emitting from the vehicle; Defendant was extremely nervous in that his carotid pulse was pounding and he did not make eye contact; Defendant produced a large 'wad' of cash from his pocket as he retrieved his license and registration;

the car was very clean; the windshield was affixed with stickers indicating support for the police. All of these observations caused Sergeant Lewis to be suspicious that Defendant might be in the possession of CDS. He also believed that he smelled the "definitive odor of cocaine." In addition, he recalled Defendant's name as a suspected drug dealer and remembered the observations he made in October 1999 of the concealed compartments in the vehicle. Considering Sergeant Lewis' observations in the aggregate, the Court finds that he had reasonable, articulable suspicion to continue to detain Defendant for further investigation. Consequently, the Court finds that the second detainment was not an unconstitutional seizure.

The final issue for the Court to decide is if the search of Defendant's vehicle was based upon probable cause. Maryland Code, Article 27, § 594B(c) provides:

A police officer may arrest a person without a warrant if the officer has probable cause to believe that a felony has been committed or attempted and that such person has committed or attempted to commit a felony whether or not in the officer's presence or view.

Probable cause requires less evidence "than would justify conviction but more evidence than that which arouse a mere suspicion." *Wilkes v. State*, 364 Md. 554, 584, 774 A.2d 420 (2001). "Because many situations which confront officers in the course executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusion of probability." *Id.* at 585, 774 A.2d 420.

Sergeant Lewis questioned Defendant outside the vehicle. Defendant did not consent to the search. Defendant denied that he was transporting any illegal substance including cocaine. Sergeant Lewis patted down Defendant to check for weapons; no weapons or other contraband were found. Among his observations, Sergeant Lewis believed that he smelled the "definitive odor of cocaine."

Odors gained from the unaided human senses may furnish evidence of probable cause. *Ford v. State of Maryland,* 37 Md.App. 373, 378, 377 A.2d 577 (1977)(*citing Johnson v. United States,* 333 U.S. 10, 13, 68 S.Ct. 367, 92 L.Ed. 436 (1948)). Knowledge gained from the sense of smell alone may be of such character as to give rise to probable cause for a belief that a crime is being committed in the presence of an officer. *Ford,* 37 Md.App. at 379, 377 A.2d 577.

In *Ford,* the officer testified that he smelled an odor of marijuana emanating from within the vehicle. *Id.* Consequently the Court found that the officer had probable cause to believe that the vehicle contained marijuana and probable cause for the Defendant's arrest existed. *Id.* at 380, 377 A.2d 577. Therefore, the search of the vehicle was valid as a search incident to an arrest, *Ford,* 37 Md.App. at 380, 377 A.2d 577 (*citing Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969)), or under the automobile exception to the Fourth Amendment. *Ford,* 37 Md.App. at 380, 377 A.2d 577; *See Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

The facts before this Court also contemplate the same principle-whether smell plus the aggravating factors constituted probable cause. Sergeant Lewis did not observe any illegal substance in plain view in the vehicle or on the body of Defendant pursuant to the frisk. The basis of his articulable suspicion was comprised of his observations including what he perceived to be the "definitive odor of cocaine."

The cocaine confiscated from Defendant's vehicle weighed 497 grams without the packaging and was cut with caffeine. It was wrapped with fabric softeners, saran wrap and clear packaging tape. It was concealed in an electronically and hydraulically controlled steel compartment below the floorboards of the vehicle, which also contained 854 grams of marijuana similarly packaged. Sergeant Lewis testified that he smelled air fresheners mixed with the "definitive odor of cocaine." When asked to describe what cocaine smells like he responded, "cocaine smells like cocaine."

\* \* \*

Based on the testimony, it is apparent that some of the witnesses associate a particular smell with the odor of cocaine-'cocaine smells like cocaine'. It is, however, scientifically impossible that the confiscated drug could be detected because the cocaine seized and the caffeine with which it was cut had no detectible odor. Although Sergeant Lewis stated that he smelled the definitive odor of cocaine, the Court finds that it was impossible for him to have done so. The Court, however, finds that Sergeant Lewis believed that he smelled cocaine from the odors with which he associated it. The cocaine was wrapped in layers of masking agents.

Notwithstanding Sergeant Lewis' belief that he smelled cocaine, based on the totality of the circumstances, the Court finds that all of the observations and prior knowledge of the police officer of Defendant and the vehicle created a reasonable and articulable suspicion to investigate further, and amounted to probable cause to search the vehicle. Defendant's constitutional right to be protected from illegal searches and seizures was not violated. The Court finds that the search of the vehicle and the seizure of the cocaine and marijuana was lawful.

**October 26, 1999**

. . . . The question becomes whether the bailee, the dealership could consent to a search by Sergeant Lewis and Detective Wentland.

\* \* \*

Once Defendant delivered the vehicle to the dealership for service, the vehicle was in the control and possession of the dealership. Mr. Willey testified that he worked on the vehicle and noticed a suspicious item that was not considered a feature of the Mazda MPV or any Mazda vehicle. Mr. Willey reported the suspicious item to his supervisor who reported the finding to the authorities.

Sergeant Lewis and Detective Wentland arrived at the dealership and Mr. Willey described to them what he had observed. The vehicle was driven to the service bay by Mr. Willey and the officers were directed to the area of the vehicle where the suspicious item had been located. Thus the bailee, the dealership, consented to the search. Sergeant Lewis and Detective Wentland moved the seat and lifted the carpeting to view what was ultimately determined to be the concealed compartments. The first compartment was opened and nothing was found. The second compartment could not be opened because it was hydraulically and electronically controlled. Sergeant Lewis attempted to open the compartment using wires but was unsuccessful; he peeked in the compartment using a screwdriver.... The actions by Sergeant Lewis and Detective Wentland did not exceed the scope of the search. The suspicious item identified by the dealership was located beneath the floorboards near the gas tank. The officers did not search any other area of the vehicle-i.e. the trunk or glove box-except where they were directed to search by the dealership employees. The Court finds that the search of Defendant's vehicle at the dealership was not an illegal search under the Fourth Amendment. The bailee's consent made it a reasonable search.

For these reasons, the Court will deny the Motion to Suppress relating to the incident that occurred on July 13, 2000, and deny the Supplemental Motion to Suppress relating to the incident that occurred on October 26, 1999.

Appellant was thereafter convicted and this appeal followed.

### Discussion

While we are persuaded that the circuit court did not make any clearly erroneous finding of fact, we are also persuaded that the circuit court erred in denying appellant's motion for suppression.[8] The Fourth Amendment guarantees

---

8. In reviewing the denial of a motion to suppress, we look only to the record of the suppression hearing and do not consider the record of the

"the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It is well settled that, under the Fourth Amendment,[9] a search conducted without a warrant issued upon probable cause is *"per se* unreasonable ... subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). It is also well settled

> that if data set forth as a basis for the existence of probable cause ... was come upon or derived as a result of an illegal search and seizure [that the party moving for suppression of evidence has "standing" to seek that relief], such primary illegality—in the absence of evidence of attenuation or a

---

trial. *Trusty v. State,* 308 Md. 658, 670–71, 521 A.2d 749 (1987) (quoting *Jackson v. State,* 52 Md.App. 327, 332 n. 5, 449 A.2d 438, *cert. denied,* 294 Md. 652 (1982)); *see also Carter v. State,* 367 Md. 447, 457, 788 A.2d 646 (2002); *Watkins v. State,* 90 Md.App. 437, 439, 601 A.2d 1115, *cert. denied,* 327 Md. 80, 607 A.2d 921 (1992). We are further limited to considering only those facts that are most favorable to the State as the prevailing party on the motion. *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239 (1990); *see also Simpler v. State,* 318 Md. 311, 312, 568 A.2d 22 (1990). In considering the evidence presented at the suppression hearing, we extend great deference to the fact finding of the suppression hearing judge with respect to the weighing and determining first-level facts. *Perkins v. State,* 83 Md.App. 341, 346, 574 A.2d 356 (1990). When conflicting evidence is presented, we accept the facts as found by the hearing judge unless it is shown that his findings are clearly erroneous. *Ferris v. State,* 355 Md. 356, 368, 735 A.2d 491 (1999); *Riddick,* 319 Md. at 183, 571 A.2d 1239. Even so, as to the ultimate conclusionary fact of whether an action taken was proper, we must make our own independent constitutional appraisal by reviewing the law and applying it to the facts of the case. *Id.; Perkins,* 83 Md.App. at 346, 574 A.2d 356.

9. Appellant's Motion to Suppress was founded on the Fourth Amendment to the Constitution of the United States, which—through the Fourteenth Amendment—is applicable to state prosecutions. *Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081 (1961). The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

source independent of such "taint—precludes the use of such derivative evidence from being a valid basis for establishing the existence of probable cause, under the doctrine of the "fruit of the poisonous tree."

*Everhart v. State,* 274 Md. 459, 480, 337 A.2d 100 (1975). The "fruit of the poisonous tree" doctrine is applicable to the judgments of conviction at issue in the case at bar.

## I.

One of the specifically established exceptions to the warrant requirement is a search that is conducted pursuant to a valid consent. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). A less common variation of the standard consent case is that of third-party consent. In *United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 2041, 39 L.Ed.2d 242 (1973), the United States Supreme Court held that a third party who "possesses common authority over or other sufficient relationship to the premises or effects sought to be inspected" may validly consent to a search of the premises or those effects. *Id.* at 171, 94 S.Ct. 988. The *Matlock* Court noted:

Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent ... rests on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Id.*

"The resolution of the issue of consent always turns on the facts of each case." *State v. Miller,* 144 Md.App. 643, 651, 799 A.2d 462 (2002). Professor LaFave's treatise on the Fourth Amendment explains that "of obvious importance" in determining whether a bailor assumes the risk that a bailee would consent to a search is "the extent to which the bailor

made efforts to secure, even as against the bailee, the privacy of his effects." 3 W. LAFAVE, SEARCH AND SEIZURE §§ 8.6(a)(3d ed.1996). LaFave went on to state:

> Where possession of the car was given on the understanding that the bailee would subject it to general use, driving it about for his own purposes, then the bailee may give effective consent to a search of those portions of the car which he could be expected to make use of. If, for example, the owner hands over both the ignition key and trunk key, then the bailee may consent to a search of the trunk, for, as noted in *United States v. Eldridge*, "access to the trunk is a normal incident to the use of an automobile." **But if the bailment of the car is for a special and limited purpose, then that purpose must be taken into account in assessing the extent of risk assumed by the bailor.**

*Id.* (Emphasis added)(footnotes omitted).

Neither the Court of Appeals nor this Court has addressed the issue of whether a mechanic has the authority to consent to a search of a vehicle that the mechanic has been authorized to repair.[10] This issue, however, has been addressed by other appellate courts, including the United States Court of Appeals for the Fourth Circuit. In *United States v. Eldridge*, 302 F.2d 463 (4th Cir.1962), the defendant loaned his automobile to a friend, who was driving the automobile when it was stopped because the police had been notified by a caller that there might be stolen guns in the automobile. The police asked if they could search the vehicle, and the friend gave them permission to do so, and voluntarily opened the trunk which revealed the presence of two stolen Coast Guard radios.[11] Prior to trial, the defendant unsuccessfully argued that the

---

**10.** "The waiver of Fourth Amendment rights by a third party most often involves a spouse, cotenant or co-owner, or a parent or guardian." *In Re Tariq A–R–Y*, 347 Md. 484, 493, 701 A.2d 691 (1997).

**11.** Officers were first drawn to the attention of the vehicle when the friend's mother-in-law called police and stated there was a stolen rifle in the back seat of the car. Officers obtained a warrant to search the vehicle, but because the friend was so cooperative in the stop, they never showed the warrant.

evidence should be suppressed because "the protection of the Fourth Amendment was a personal right that could not be waived for him by ... a gratuitous bailee of the car." His motion was denied. The appellate court affirmed, explaining:

On the merits of the constitutional issue we agree with the result reached by the District Court. Not every search made without a warrant is illegal. The Fourth Amendment prohibits only 'unreasonable' searches and seizures. Such decision as have been cited to us or discovered by research have only a peripheral bearing on the question to be decided in this case. Lower federal courts have deemed searches reasonable if consented to by the person in lawful possession of the articles seized, or the premises on which they are found, as where the defendant's partner consented to a search, where an office manager in sole control of the office and the corporate records consented to the search and seizure, where the owner-occupant of a house consented to search of the living room in which the defendant customarily slept on a couch, where the wife of the defendant consented to a search of their home, and where an owner consented to a search of his garage and the article seized, which had been stored there by the defendant, was not packaged or otherwise concealed. These decisions do not furnish particularly helpful guides to the answer to the precise question raised here, namely, whether the bailor's constitutional immunities were violated in the search consented to by his bailee. The appellant mistakenly contends that the recent case of *Chapman v. United States*, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961), supports him. That case is not analogous to this, for here consent was given by the bailee in actual lawful possession of the car, and it is the bailor who claims that his constitutional rights were violated by the search. If *Chapman* sheds any light whatever on the question that concerns us here, it is possibly in the indication it gives that authorization of the search may come from a person in actual lawful possession, and that his rights may not be waived by an owner who has the right to reclaim possession, but has not done so.

[The friend's] right to possession of the vehicle was less formal or durable than that of the tenant Chapman to occupancy of the house under his lease. Still, for the time being [the friend] was clothed with rightful possession and control and could do in respect to the automobile whatever was reasonable and not inconsistent with its entrustment to him. No restriction was imposed on him except to return with the car by a certain hour. Although the defendant knew of the presence of the stolen radios in the trunk, he apparently did not think it worthwhile to take the precaution of forbidding his bailee to open the trunk or permit anyone to look into it. He reserved no exclusive right of privacy in respect to the trunk when he delivered the key. In responding as he did to the police, [the friend] did not exceed the authority [the defendant] had seemingly given him. Using the key to open the trunk was not an unwarranted exercise of dominion during the period of his permissive possession and use. Access to the trunk is a normal incident to the use of an automobile. And if, when he voluntarily opened the trunk, [the friend] did not exceed proper bounds because he had to that extent at least concurrent rights therein with [the defendant], was the ensuing search by the police unreasonable? We think not. **Had the police done more than look with [the friend's] consent into the trunk and observe what was readily visible and not covered over or concealed in package or wrapper—if, for example, they had explored under the floor carpeting or behind the upholstery—we might have a different case.** *United States v. Lefkowitz,* 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877 (1932); *United States v. Kirschenblatt,* 16 F.2d 202, 203, 51 A.L.R. 416 (2d Cir.1926). There is no suggestion that [the friend] obtained possession of the car with any deceptive purpose against [the defendant] or in collusion with the officers.

*Eldridge,* 302 F.2d at 465–466 (emphasis added).

In *State v. Farrell,* 443 A.2d 438 (R.I.1982), the Rhode Island Supreme Court was presented with facts that are very similar to the facts of the case at bar. In *Farrell,* the

defendant left a vehicle at a local garage, having authorized repairs to a dent on the left front fender of the car. A stolen vehicle investigation led police to the garage where defendant had dropped off his vehicle. An examination of the vehicle identification number of the defendant's vehicle revealed that the vehicle was stolen. At this point, an officer asked the owner of the garage for permission to tow the car to the police station. After some discussion, the owner of the garage consented. The trial court rejected the defendant's contention that the owner of the garage had no authority to consent to the car being impounded. The appellate court held that the trial court should have granted the motion for suppression, explaining:

> The doctrine that recognizes the validity of third party consent to a search must be applied cautiously to prevent erosion of the Fourth Amendment protections. This is especially true because consent eliminates the requirement of probable cause. As the Supreme Court in *Stoner v. California,* [376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964)]*supra,* stated:
>
> > "Our decisions make clear that the rights protected by the fourth amendment are not to be eroded by strained applications of the law of agency or by unrealistic doctrines of 'apparent authority.' " *Id.* at 488, 84 S.Ct. at 892, 11 L.Ed.2d at 860.
>
> We hold that one who entrusts his automobile to another for the purposes of repair, or periodic inspection as required by law, does not confer the kind of mutual use or control which would empower that person to consent to a warrantless search and seizure. In view of our finding of no consent, coupled with the failure of the state to justify the warrantless seizure on any other ground, the evidence obtained by the police as a result of the seizures is inadmissible and should have been suppressed. The defendant is entitled to a new trial.

*Farrell,* 443 A.2d at 442. We agree with that analysis.

 In the case at bar, the bailment of appellant's vehicle was for the limited purpose of replacing the fuel pump. In

order to replace the fuel pump, mechanics needed to access areas of the car where the secret compartments were located. Appellant never explicitly restricted access to those areas of the vehicle. Therefore, once appellant relinquished his keys, he assumed the risk that the mechanics might come across the compartments. Although the dealership acquired common authority over those portions of the vehicle that would be exposed during (1) the process of repairing the vehicle, and (2) the period of time during which the repairs were being made, the dealership was not authorized to consent to a search of the vehicle after the repairs had been completed.

There is a significant difference between (1) authorizing a mechanic to observe what is located in those portions of a vehicle being repaired, and (2) authorizing a mechanic to consent to a law enforcement officer's request for permission to conduct a post-repair examination of those portions of the vehicle that are no longer clearly visible. When Sergeant Lewis and Detective Wentland arrived at the dealership, the authorized repairs to appellant's vehicle had been completed, the vehicle had been parked, and was ready to be picked up. A visual examination of the repaired vehicle did not reveal anything suspicious. Although Sergeant Lewis and Detective Wentland had been told that a mechanic noticed something "suspicious" located in the vehicle, that information did not justify a warrantless search of the vehicle involving the unbolting of seats, pulling up carpet, and using screwdrivers to pry open compartments.[12]

---

**12.** In *Shipman v. State*, 291 Ala. 484, 282 So.2d 700 (1973), several individuals were detained by police after a store owner complained that the individuals were misbehaving. Police observed one individual transfer an object (clearly not a weapon) from his hand into the top of his boot. Police seized the object under the plain view rationale. It turned out that the object contained heroin. The individual was convicted, but the conviction was reversed on the ground that there was no probable cause to believe that the object seized contained contraband. The Supreme Court of Alabama explained:

> The reason for this rule is apparent. If the rule were otherwise, an officer, acting on mere groundless suspicion, could seize anything and everything belonging to an individual which happened to be in plain view on the prospect that on further investigation some of it

Sergeant Lewis and Detective Wentland had the right to (1) remain at the dealership until appellant arrived (or the right to return to the dealership at that time); (2) question appellant about the information they received from the mechanic; and (3) ask appellant for permission to search the vehicle. They did not, however, have the right to make a warrantless re-entry into—and a minute examination of—those portions of the vehicle that were no longer clearly visible.[13] For these reasons, the "fruit of the poisonous tree" doctrine is applicable to the October 29, 1999 search, and the information obtained by Sergeant Lewis as a result of that search cannot be used in any way to establish probable cause for the July 13, 2000 search.[14]

---

might prove to have been stolen or to be contraband. It would open the door to unreasonable confiscation of a person's property while a minute examination of it is made in an effort to find something criminal. Such a practice would amount to the "general exploratory search from one object to another until something incriminating at last emerges" which was condemned in *Coolidge v. New Hampshire*, [403 U.S. 443, 91 S.Ct. 2022, 29 L.E.2d 564 (1971)]*supra*. Ex post facto justification of a seizure made on mere groundless suspicion, is totally contrary to the basic tenets of the Fourth Amendment.

*Shipman*, 291 Ala. at 488, 282 So.2d 700. This Court expressly approved of that analysis in *Dixon v. State*, 23 Md.App. 19, 32–33, 327 A.2d 516 (1974).

**13.** If Officer Wentland and Sergeant Lewis had been called to the dealership at a point in time when (1) the vehicle was in the process of being repaired, and (2) the suspicious compartments were clearly visible, the "fruit of the poisonous tree" doctrine would not require suppression of information they obtained by observing whatever the mechanic was able to observe at that point in time. Third party consensual searches, however, are limited to items that are clearly visible. *United States v. Block*, 590 F.2d 535, 541 (4th Cir.1978). Therefore, had those circumstances been present in the case at bar, the "fruit of the poisonous tree" doctrine would operate to exclude only information acquired by the officers during an examination of those portions of the vehicle (1) that were not clearly visible, and (2) that the mechanic would not examine in the process of completing the work that the owner had authorized.

**14.** The "fruit of the poisonous tree" doctrine does not operate to exclude whatever information was received by Sergeant Lewis *before* he began to search the vehicle. "[T]he exclusionary rule as to evidence seized in violation of the Fourth Amendment comes into play only when the evidence is obtained by governmental action." *Herbert v. State*, 10

## II.

In *Ferris v. State*, 355 Md. 356, 735 A.2d 491 (1999), appellant was stopped by an officer because he was traveling faster than the posted speed limit. The officer issued appellant a citation for speeding. Before allowing appellant to go on his way, the officer asked appellant to exit his vehicle so he could ask him a few questions. It was during this questioning that appellant eventually admitted that the vehicle he was driving contained marijuana. At a pretrial hearing, appellant moved to suppress all evidence and statements illegally obtained by the officers. The trial court denied his motion and appellant was convicted of speeding and possession of marijuana. This Court affirmed. The Court of Appeals reversed, explaining:

> The Fourth Amendment protects against unreasonable searches and seizures, including seizures that involve only a brief detention. *United States v. Mendenhall*, 446 U.S. 544, 551, 100 S.Ct. 1870, 1875, 64 L.Ed.2d 497 (1980). The Supreme Court has made clear that a traffic stop involving a motorist is a detention which implicates the Fourth Amendment. *See United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985); *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984) (analogizing the degree of intrusiveness of the usual traffic stop to the degree of restraint imposed by the typical Terry stop). It is equally clear, however, that ordinarily such a stop does not initially violate the federal Constitution if the police have probable cause to believe that the driver has committed a traffic violation. *Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996). Nonetheless, the Supreme Court has

---

Md.App. 279, 284, 269 A.2d 430 (1970). In the case at bar, however, the non-clearly erroneous findings of fact made by the circuit court do not permit us to conclude as a matter of law that the July 13, 2000 search can be upheld by (1) excluding the fruits of the search conducted by Sergeant Lewis and Detective Wentland on October 29, 1999, and (2) combining the *observations* made by Sergeant Lewis on July 13, 2000 with the *information* received by Sergeant Lewis *before* he searched the vehicle on October 29, 1999.

also made it clear that the detention of a person "must be temporary and last no longer than is· necessary to effectuate the purpose of the stop." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) (plurality opinion).

It is without dispute that the stop of Ferris by Trooper Smith for exceeding the posted speed limit constituted a seizure for Fourth Amendment purposes, but that such a seizure was justified by the probable cause possessed by the trooper in having witnessed Ferris's traffic violation. Indeed, Ferris does not contest the initial stop. The real issue lies in the actions taken by the officer after he had issued the speeding citation to Petitioner and had returned his driver's license and registration to him.

\* \* \*

**[T]he officer's purpose in an ordinary traffic stop is to enforce the laws of the roadway, and ordinarily to investigate the manner of driving with the intent to issue a citation or warning. Once the purpose of that stop has been fulfilled, the continued detention of the car and the occupants amounts to a second detention.** *See Royer,* 460 U.S. at 500, 103 S.Ct. at 1325–26. **Thus, once the underlying basis for the initial traffic stop has concluded, a police-driver encounter which implicates the Fourth Amendment is constitutionally permissible only if either (1) the driver consents to the continuing intrusion or (2) the officer has, at a minimum, a reasonable, articulable suspicion that criminal activity is afoot.** *United States v. Sandoval,* 29 F.3d 537, 540 (10th Cir.1994).

\* \* \*

When, as here, the purpose for which the investigatory stop was instituted has been accomplished and no other reasonable suspicion exists to support further investigation, there is no justification for continued detention and interrogation of citizens.

*People v. Redinger,* 906 P.2d 81, 85–86 (1995) (en banc) (footnote omitted). *See United States v. Soto–Cervantes,*

138 F.3d 1319, 1322 (10th Cir.1998), *cert. denied,* 525 U.S. 853, 119 S.Ct. 131, 142 L.Ed.2d 106 (1998); *Karnes v. Skrutski,* 62 F.3d 485, 491 (3rd Cir.1995); *United States v. Ramos,* 42 F.3d 1160, 1163 (8th Cir.1994); *United States v. Obasa,* 15 *F.3d 603, 607 (6th Cir.1994); People* v. *Rodriguez,* 945 P.2d 1351, 1360 (Colo.1997) (en banc); *Commonwealth v. Torres,* 424 Mass. 153, 674 N.E.2d 638, 642 (Mass.1997). *See also Berkemer,* 468 U.S. at 439–40, 104 S.Ct. at 3150 ("Unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released") (footnotes omitted); *Davis v. State,* 947 S.W.2d 240, 243 (Tex.Crim.App.1997) (en banc) ("Once the reason for the stop has been satisfied, the stop may not be used as a 'fishing expedition for unrelated criminal activity.'" quoting *Ohio v. Robinette,* 519 U.S. 33, 117 S.Ct. 417, 422, 136 L.Ed.2d 347 (1996) (Robinette II) (Ginsburg, J., concurring)). Many of these cases employing careful scrutiny if not skepticism over continued detentions in the context of traffic stops are consistent with the admonition of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and its progeny that Terry stop must not only be justified at its inception, but its scope throughout must be reasonably related to the circumstances which justify the intrusion. *United States v. Babwah,* 972 F.2d 30, 33 (2nd Cir.1992). We conclude, after considering all the circumstances of the initial encounter between Trooper Smith and Petitioner, that the traffic stop essentially came to an end upon the trooper's delivery of the citation, and return of the driver's license and registration. Once Ferris signed and returned the citation in compliance with Maryland traffic laws, Maryland Code (1977, 1999 Repl.Vol.), § 26–203 of the Transportation Article, he had completed all his duties pertaining to the traffic stop itself. Because the traffic stop had ended there, Ferris was lawfully free to drive away, as Trooper Smith himself acknowledged in his own testimony.

*Ferris,* 355 Md. at 369–373, 735 A.2d 491. (Emphasis added).

In the case at bar, appellant argues that Sergeant Lewis lacked reasonable, articulable suspicion to continue to detain

appellant after the initial purpose of the traffic stop was complete.[15] The circuit court opined that, when several factors it identified were considered as a whole, Sergeant Lewis did have reasonable and articulable suspicion to detain appellant after the purpose of the initial traffic stop was over.[16] For reasons stated above, Sergeant Lewis' knowledge of the two compartments in appellant's vehicle cannot be used to establish either reasonable articulable suspicion to detain appellant or probable cause to search appellant's vehicle. It is true that Sergeant Lewis testified that he smelled the "definitive odor of cocaine," and that testimony—if accepted as true—would have established probable cause for both an arrest and a search. The circuit court, however, expressly rejected that testimony.[17] We must therefore examine the

---

**15.** In *United States v. Arvizu*, 534 U.S. 266, 273, 274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002), the United States Supreme Court again emphasized that suppression hearing courts must examine the "totality of the circumstances" when making a "reasonable suspicion" determination:

When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person." Although an officer's reliance on a mere "hunch" is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.

**16.** Those observations included: (1) a strong odor of air fresheners; (2) appellant seemed extremely nervous in that his carotid pulse was pounding and he did not make eye contact; (3) appellant produced a large wad of money from his pocket as he retrieved his license and registration; (4) the car was very clean; (5) the windshield was affixed with police stickers; (6) Sergeant Lewis's prior knowledge of the secret compartments in the vehicle; (7) Sergeant Lewis smelled the definite odor of cocaine emanating from the vehicle; and (8) Sergeant Lewis's knowledge that appellant was a suspected drug dealer.

**17.** In finding that "Sergeant Lewis and Detective Wentland moved the seat and lifted the carpeting to view what was ultimately determined to be the concealed compartments," the circuit court also rejected Sergeant Lewis' testimony that it was an employee of the dealership rather

remaining factors to determine whether there existed proba-
ble cause for the warrantless search of appellant's vehicle.

## Appellant Seemed Nervous

 Sergeant Lewis testified that appellant seemed ex-
tremely nervous, which indicated that there could be criminal
activity afoot. In *Ferris, supra,* the Court of Appeals stated:

> "The nervousness, or lack of it, of the driver pulled over by
> a Maryland State trooper is not sufficient to form the basis
> of police suspicion that the driver is engaged in the illegal
> transportation of drugs. There is no earthly way that a
> police officer can distinguish the nervousness of an ordinary
> citizen under such circumstances from the nervousness of a
> criminal who traffics in narcotics. An individual's physio-
> logical reaction to a proposed intrusion into his or her
> privacy cannot establish probable cause or even grounds to
> suspect. Permitting [a] citizen's nervousness to be the basis
> for a finding of probable cause would confer upon the police
> a degree of discretion not grounded in police expertise, and,
> moreover, would be totally insusceptible to judicial re-
> view...."

*Id.* at 388, 735 A.2d 491 (quoting *Whitehead v. State,* 116
Md.App. 497, 698 A.2d 1115, *cert. denied* (1997)). The trial
court gave more weight to Sergeant Lewis' determination that
appellant was "extremely nervous" than *Ferris* permits. We
take judicial notice that it is more likely so than not so that,
when a uniformed law enforcement officer stops a motorist for
speeding, the motorist will exhibit signs of nervousness. We
reject the proposition that law enforcement officers are enti-
tled to detain a motorist on the ground that the motorist fails

than a law enforcement officer who "pulled [the seat] back" to "show
me what they had found which prompted them to call the police."
Because that testimony was rejected, and the record contains no other
evidence of what was actually told to the law enforcement officers
before they began searching the vehicle, we are unable to conclude that
the July 13, 2000 search can be justified on the basis of (1) the
*observations* made by Sergeant Lewis on that date, and (2) the *informa-
tion* provided to Sergeant Lewis on October 29, 1999.

to make "eye contact" and/or the motorist's "carotid pulse" is "pounding."

## Smell of Air Fresheners

In *Snow v. State,* 84 Md.App. 243, 261, 578 A.2d 816 (1990), this Court stated that "[a]ir fresheners are, as far as we know, a completely legitimate object; some are, undoubtedly, thought to be ornamental as well as functional." Although air fresheners may give rise to a "hunch," they simply do not constitute a reasonable articulable suspicion. *Charity v. State,* 132 Md.App. 598, 639, 753 A.2d 556 (2000).

We recognize that in *Nathan v. State,* 370 Md. 648, 805 A.2d 1086 (2002), the Court of Appeals noted that the presence of an "overwhelming" odor of an air freshener can be included in the combination of factors that justify an investigative detention. That case, however, does not hold that the odor of an air freshener "taken together" with the motorist's nervousness are sufficient grounds to justify an investigative detention. In *Nathan,* while checking for license and registration, the officer also observed that (1) the van's ceiling appeared new and lower than normal; (2) the van's occupants seemed very nervous and provided inconsistent stories about their trip; and (3) Nathan was unable to produce identification. The Court of Appeals stated:

The fact that Nathan, the driver was unable to produce identification, in combination with Sgt. Lewis' observations of Nathan and Shaw's extreme nervousness, Shaw's apparent pretense of sleep when the vehicle was initially stopped, Nathan's evasive answers regarding his travel plans, the inconsistent versions of the trip itinerary and purpose provided by Nathan and Shaw, the "overwhelming" odor of air freshener, and the altered ceiling that led the officer to believe that the van had a hidden compartment, as well as the police observations prior to the traffic stop (the passenger's head bobbing up and down in the rear window), were sufficient grounds, taken together, reasonably to warrant an investigative detention.

*Id.* at 664–665, 805 A.2d 1086 (footnotes omitted) (citations omitted). In the case at bar, because (1) the "fruit of the poisonous tree" doctrine applies to Sergeant Lewis' knowledge that there were hidden compartments in appellant's vehicle, (2) there was nothing "evasive" about appellant's answers to any question, and (3) appellant produced a valid driver's license and registration, we conclude that *Nathan* requires a reversal of appellant's convictions.

## Additional Factors

 The remaining factors—a clean car, the "wad" of money, police stickers, and the fact that appellant was "under investigation" by the Wicomico Drug Task Force—simply do not add up to justify the July 13, 2000 warrantless search of appellant's automobile. Once the information obtained during the October 29, 1999 search is redacted from the probable cause equation, it is clear that appellant's motion for suppression should have been granted.

**JUDGMENTS REVERSED; COST TO BE PAID BY ANNE ARUNDEL COUNTY.**